# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

CYNTHIA DIZIO and JAMES DIZIO,   )     Civil Action No.
individually and on behalf of Jane Doe,  )    18-12489-FDS
their minor child,                  )
                                     )
       Plaintiffs,           )
                                     )
       v.                    )
                                     )
MANCHESTER ESSEX REGIONAL     )
SCHOOL DISTRICT, PAMELA BEAUDOIN, )
STEVE GUDITIS, ALLISON COLLINS,   )
HELEN BRYAN, DEBRA WELLING,    )
KEVIN O'MALEY, and DONNA SMITH,  )
                                     )
       Defendants.         )
_____)

## AMENDED MEMORANDUM AND ORDER
## ON DEFENDANTS' MOTION TO DISMISS

**SAYLOR, J.**

This lawsuit arises out of a dispute between a school district and the parents of a disabled child.[1] The complaint alleges a claim arising under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794; a claim under 42 U.S.C. § 1983, asserting violations of the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. § 1400 *et seq.*; and various other statutory and common-law claims.

---

[1] The Court's Memorandum and Order was issued on August 8, 2019, the same day that the First Circuit issued its decision in *Parent/Professional Advocacy League, et al. v. City of Springfield, et al.*, 2019 WL 3729033 (1st Cir. Aug. 8, 2019). This Amended Memorandum and Order has been issued to provide updated citations in light of that opinion.

Plaintiffs Cynthia and James Dizio are the parents of Jane Doe.[2]  According to the complaint, Jane is approximately 16 years old and has a variety of disabilities, including attention deficit/hyperactivity disorder ("ADHD"), predominantly inattentive presentation, anxiety disorder, school refusal, depression, slow processing disorder, possible mood disorder, and executive function deficiencies.  In substance, plaintiffs allege that defendants Manchester Essex Regional School District ("MERSD") and the various named school officials refused to provide Jane with a free appropriate public education ("FAPE"), as guaranteed by IDEA.

As a general matter, the IDEA requires plaintiffs to exhaust administrative remedies before bringing suit.  Plaintiffs here did not bring their claims before the Massachusetts Board of Special Education Appeals ("BSEA"), and therefore have not satisfied that requirement.  The complaint instead asserts federal and state claims on a variety of theories that essentially seek to avoid a failure-to-exhaust defense.

Based principally on plaintiffs' failure to exhaust, defendants have moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  For the reasons stated below, the motion will be granted.

## I.     Background

### A.     Statutory Background

The IDEA conditions the provision of federal funds to public schools on compliance with a requirement to provide all disabled children with a "free appropriate public education."  *See Parent/Prof'l Advocacy League v. City of Springfield*, 2019 WL 3729033, at *2 (1st Cir. Aug. 8, 2019) (quoting 20 U.S.C. §1412(a)(1)) (citing *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,

---

[2] Jane Doe is a pseudonym.

548 U.S. 291, 295-96 (2006)). "As defined in the Act, a FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and 'sufficient supportive services' to permit the child to benefit from that instruction." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748-49 (2017) (quoting 20 U.S.C. § 1401(9), (26), (29)); *see also Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017).

### 1.    Individualized Education Programs

The individualized education program ("IEP") is the IDEA's primary means for assuring the provision of a FAPE to disabled children. "IEPs are 'comprehensive plan[s]' developed by the child's teachers, school officials, and parents." *Parent/Prof'l Advocacy League*, 2019 WL 3729033, at *2 (quoting *Endrew F.*, 137 S. Ct. at 994). At a minimum, "[e]ach IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005). "[T]he services offered in an IEP amount to a FAPE if they are 'reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'" *C.D. by & through M.D. v. Natick Pub. Sch. Dist.*, 924 F.3d 621, 624-25 (1st Cir. 2019) (quoting *Endrew F.*, 137 S. Ct. at 1001); *see also Parent/Prof'l Advocacy League*, 2019 WL 3729033, at *3.

### 2.    IDEA Administrative Procedures

If a dispute arises between parents and a school district concerning the application of IDEA to a particular child, the statute requires the state to convene an impartial hearing. 20 U.S.C. § 1415(f)(1)(A). "Hearing officers can grant substantive relief, such as reimbursement for private school tuition or an order that a school district must offer the student an appropriate educational program." *Parent/Prof'l Advocacy League*, 2019 WL 3729033, at *3 (citing *School*

*Comm. of Burlington v. Department of Educ. of Mass.*, 471 U.S. 359, 370) (1985)). "But relief may only be granted based on a determination of whether the child received a [FAPE]." *Id.* (quoting 20 U.S.C. § 1415(f)(3)(E)(i)).

In Massachusetts, those impartial hearings required by the IDEA are conducted by the Bureau of Special Education Appeals. *See* Mass. Gen. Laws ch. 71B, § 3; 603 C.M.R. 28.08(5); *see also Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 988 (1st Cir. 1990). Under Massachusetts law, the BSEA has jurisdiction to hear disputes

> between and among parents, school districts, private schools and state agencies concerning: (i) any matter relating to the identification, evaluation, education program or educational placement of a child with a disability or the provision of a free and appropriate public education to the child arising under this chapter and regulations promulgated hereunder or under the Individuals with Disabilities Act, 20 U.S.C. § 1400 *et seq.*, and its regulations; or (ii) a student's rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its regulations.

Mass. Gen. Laws. ch. 71B, § 2A(a).

The BSEA's administrative decision is reviewable in either state or federal court. *See* 20 U.S.C. § 1415(i)(2)(A), (i)(2)(C)(iii); *see also Parent/Prof'l Advocacy League*, 2019 WL 3729033, at *3. However, before such an action may be brought, the party seeking review must exhaust all administrative procedures under the IDEA. 20 U.S.C. § 1415(l).

### 3. Rehabilitation Act of 1973

Section 504 of the Rehabilitation Act requires that "no . . . individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in . . . any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); *see also* 34 C.F.R. 104.4. As applied to public education, Section 504 requires that disabled children have equal access to educational opportunities that non-disabled children enjoy. *Id.* In addition, under Section 504, if parents dispute the school district's identification,

evaluation, or placement of disabled students, an impartial hearing must be held. 34 C.F.R. 104.36.

Section 504 is not coextensive with the IDEA. "While the IDEA focuses on the provision of appropriate public education to disabled children, the Rehabilitation Act of 1973 more broadly addresses the provision of state services to disabled individuals." *Mark H. v. Lemahieu*, 513 F.3d 922, 929 (9th Cir. 2008). Nevertheless, public schools receiving federal funds must still "provide a free appropriate public education to each qualified handicapped person" under Section 504. *Id.*

## B.    Factual Background

The facts are set forth as alleged by plaintiffs in the complaint and attached exhibits.

Cynthia ("Cindy") and James ("Jim") Dizio are residents of Essex, Massachusetts, and the parents of Jane Doe. (Compl. ¶¶ 3-5). Jane is approximately 16 years old. (*Id.* ¶ 21). According to the complaint, she has a variety of disabilities, including ADHD, predominantly inattentive presentation, anxiety disorder, school refusal, depression, slow processing disorder, possible mood disorder, and executive function deficiencies. (*Id.* ¶ 22). Although she has since changed schools, during most of the relevant period she was a student in MERSD. (*Id.* ¶ 6).

### 1.    Elementary School

Cindy first expressed concerns about Jane's performance in school during the 2009-2010 school year, when Jane was in first grade. (*Id.* ¶ 24). She told MERSD staff in meetings and by e-mail that she was concerned that Jane was not finishing her schoolwork at the same rate as other students. (*Id.* ¶¶ 23-24). The school did not test Jane for special-education eligibility that year. (*Id.*).

When Jane was in the second, third, and fourth grades, Cindy continued to express

concerns about her academic difficulties to MERSD staff. (*Id*. ¶¶ 26-27, 29). Jane was not, however, evaluated for special-education eligibility. (*Id*. ¶ 28). According to the complaint, when Jane was in fourth grade, Jennifer Kelly, Psy.D., diagnosed ADHD and recommended that Cindy request testing through the school to get a "504 plan." (*Id*.). On January 3, 2013, Cindy requested an evaluation from the school. (*Id*. ¶ 30).

On March 25, 2013, Jane was evaluated by Dr. Debra Welling, an elementary-school psychologist. (*Id*. ¶ 32). The complaint alleges that Dr. Welling noted that Jane's slower processing ability made it difficult for her to keep up in class. (*Id*.). However, on April 29, 2013, Helen Bryan, the MERSD special-education coordinator, wrote to Cindy to inform her that Jane was not eligible for special-education services. (*Id*. ¶ 33).

When Jane was in fifth grade, Cindy continued to express concerns to MERSD staff. (*Id*. ¶ 34). In January 2014, Jane was evaluated by Dr. Kathy Pennoyer. The complaint alleges that Dr. Pennoyer noted her slow processing speeds and recommended accommodations. (*Id*. ¶ 35). In March 2014, Kelly requested various accommodations for Jane. (*Id*. ¶¶ 36-39). School officials advised her that Jane did not qualify. According to the complaint, throughout that school year, Jane continued to struggle with homework, became withdrawn, and stopped attending extracurricular activities. (*Id*. ¶¶ 38-40).

### 2. Middle School

During the summer between Jane's fifth- and sixth-grade years, Cindy and Jim met with middle-school principal Steve Guditis to discuss their concerns about Jane's transition to middle school. (*Id*. ¶ 41).

During Jane's sixth-grade year, Jim and Cindy met with and e-mailed Jane's teachers to ask for help with her struggles in school and with homework. (*Id*. ¶ 42). Principal Guditis

suggested that Jane work with an interventionist. (*Id*. ¶ 43). According to the complaint, Cindy again requested a plan for Jane and was again denied. (*Id*.). The school did not evaluate Jane and did not provide special-education services that school year. (*Id*. ¶ 44).

In September 2015, Jane's seventh-grade year, Cindy e-mailed MERSD to request that Jane continue working with the interventionist. (*Id*. ¶ 45). In October, Cindy and Jim hired an advocate and continued to seek an IEP and plan for Jane. (*Id*. ¶ 46). According to the complaint, Jane's mental health continued to deteriorate, and she fell behind in her classes. (*Id*.). On October 13, 2015, Cindy requested a psycho-educational reevaluation. (*Id*. ¶ 47).

On November 13, 2015, Cindy e-mailed Principal Guditis and Allison Collins to request an emergency meeting concerning Jane's inability to access the curriculum at the school and her deteriorating emotional health. (*Id*. ¶ 48). According to the complaint, Jane's therapist, Dana Modell, diagnosed "school refusal/school phobia (where students because so anxious and fearful that they cannot go to school)" and wrote a letter to MERSD explaining Jane's emotional decline and need for support. (*Id*.). The emergency meeting was held on November 19, and all of Jane's teachers except for one waived her outstanding assignments. (*Id*.).

### a. Child Requiring Assistance Case

According to the complaint, Jane missed five days of school during the first week of December 2015, two days due to a stomachache, and three because she was "terrified to go to school" and therefore "too emotionally fragile" to attend. (*Id*. ¶¶ 50-51, 73).

On the fourth day of that week, December 4, 2015, Principal Guditis e-mailed Cindy and Jim concerning Jane's absences. (*Id*. ¶ 51). He wrote that "we [at MERSD] share your concern that Jane has refused to attend school for the past four school days." (*Id*.). He elaborated:

> In response to Jane's reported challenges with homework and emotional
> regulation at home, we have communicated frequently and recently met to

develop additional interventions. In addition, staff and I have offered and suggested multiple interventions to help Jane attend school . . . . As we have previously discussed, I am very eager to work collaboratively with you in supporting Jane's consistent attendance. If we are unable to work successfully on the attendance issue due to Jane's resistant to attending school, I will need to seek collateral agency support for Jane in order to resolve this matter.

(*Id*.).

Cindy responded to the e-mail the same day, stating that "I don't believe it has been 4 days of refusal," and asserting that only two of those four absences were due to school refusal—that is, days when Jane "could not get herself to go"—but that the other two were due to a stomachache. (*Id*. ¶ 52). She then addressed their recent communications concerning additional support for Jane:

Yes, we have communicated frequently. And we met the week before Thanksgiving to discuss interventions to support Jane in school. However, the few days Jane did go to school after that, [only one of the interventions we discussed was implemented,] . . . that is all that happened. Jane knows that we have been working diligently to get her support that she needs but she is not feeling supported in school . . . . [Jane] has been struggling for the last 3 years, so much so that we have asked for various supports that have not been addressed effectively. The weight of pressure she feels in school is what is immobilizing her to attend . . . . I believe we all want what is best for Jane and if going to school is causing her the stress and anxiety that she is displaying, then for now, it doesn't seem that that is what is best for Jane.

(*Id*.). Principal Guditis responded to Cindy's e-mail later that day informing her that he had filed a Child Requiring Assistance ("CRA") case with the Essex Juvenile Court. (*Id*. ¶ 53).

On December 8, 2015, Cindy brought Jane to a psychiatric-crisis center and later to her therapist and to her primary-care physician, Dr. Jonathan March. (*Id*. ¶ 57). Dr. March wrote a request for temporary home and hospital education. (*Id*.). According to the complaint, he explained in that request that Jane "was in such a state of anxiety that she was unable to access the curriculum in a traditional classroom setting and until appropriate accommodations were made . . . , she would require a home tutor." (*Id*.).

On December 9, 2015, Collins wrote to the Dizios "to provide a summary of meeting findings, respond to several recent inquiries from you and your advocate, and recommend next steps." (*Id*. ¶ 58). She wrote, among other things, that although "Jane has struggled with attendance and emotional and behavioral issues at home per your report," MERSD "did not agree that these issues resulted from her diagnosed disability (ADHD)" and "felt that more information was needed to determine whether Jane presents with an emotional disability . . . ." (*Id*.).

"While waiting for MERSD to comply with [Dr. March's] request for home and hospital education," Cindy and Jim hired a tutor for Jane. (*Id*. ¶ 59). They also continued to e-mail the school about Jane's current emotional state, including her school refusal, and their request for MERSD to arrange tutoring for her. (*Id*. ¶¶ 59-60).

On December 15, 2015, Collins wrote to Cindy and Jim explaining that the request from Dr. March did not satisfy the requirements for home-hospital tutoring. (*Id*. ¶ 61).

### b. Withdrawal from MERSD

On December 18, 2015, Cindy enrolled Jane in TEC Connections Academy Commonwealth Virtual School ("TECCA"), a Massachusetts online public school. (*Id*. ¶ 64). In the preceding days, Jane apparently was "crying uncontrollably when forced to go to school" and felt "pressured" by Principal Guditis to attend class despite her emotional instability. (*Id*. ¶ 63). "In response," the Dizios enrolled Jane in TECCA and withdrew her from MERSD schools. (*Id*. ¶ 64).

At TECCA, Jane was put on an IEP but still struggled to keep up. (*Id*. ¶ 67). In early January 2016, Jane underwent a neuropsychological examination with Dr. Susan Brefach, who

allegedly confirmed her slow processing speeds.  (*Id*. ¶ 66).

Near the end of Jane's seventh-grade year, Cindy and Jim enrolled her in New Hope Tutorials to provide her with more peer interaction.  (*Id*. ¶ 70).

In April 2016, Jane inquired about re-enrolling in the journalism club at MERSD, although she was no longer a student at the school.  (*Id*. ¶ 69).  Cindy spoke with an administrative assistant at MERSD, who apparently told her that Principal Guditis "had granted permission for Jane to participate in any after school clubs and dances."  (*Id*.).  Jane began attending journalism club weekly thereafter, but remained "withdrawn and depressed from lack of peer interaction."  (*Id*.).

At the beginning of the 2016-2017 school year, Cindy and Jim inquired whether MERSD would honor Jane's IEP and 504 plan if she returned to school.  (*Id*. ¶ 71).  They met with the school principal to discuss the resources that they believed Jane would need.  (*Id*.).

In October 2016, Jane enrolled in the Rockport school system.  (*Id*. ¶ 75).  The complaint alleges that at Rockport she was "forced to repeat seventh grade as a result of her denial of special education resources by the Defendants."  (*Id.*).

According to the complaint, in October 2016, Jane asked to attend the MERSD Halloween dance.  (*Id*. ¶ 72).  At that point, she was not enrolled in the MERSD schools.  The complaint alleges that MERSD staff originally told her she could attend the dance, but told her a week later that she could not.  (*Id.*).  An MERSD staff person also allegedly told Cindy at that time that Jane could no longer participate in journalism club, or any other after-school clubs, going forward.  (*Id*. ¶ 73).

On October 19, 2016, Cindy e-mailed superintendent Pamela Beaudoin and the MERSD School Committee concerning, among other things, their refusal to permit Jane to participate in

extracurricular activities. (*Id.*). She asked the superintendent to identify the specific district policy that purportedly prevented students like Jane who are "within [the] district [but] who attend virtual school" from participating in extracurriculars. (*Id.*). She also elaborated on the circumstances surrounding Jane's December 2015 school absences that preceded the CRA case. (*Id.*). She stated that Jane was struggling to keep up in school at that time, and that she was so stressed and terrified that she would become physically sick if she went to school. (*Id.*). "Jane was not being truant . . . she was not skipping school to hang out with friends . . . she was terrified," she wrote. (*Id.*) (alterations in original). As to the Dizios' decision to withdraw Jane from MERSD, she wrote that they "had no choice . . . after repeatedly being denied appropriate supports for her disabilities." (*Id.*).

According to the complaint, "[i]n response" to Cindy's e-mail, the superintendent discriminated against Jane and retaliated against Cindy and Jim by "refusing to permit Jane to attend the dance or any other extracurriculars." (*Id.* ¶ 74).

## C. **Procedural Background**

The complaint in this action was filed on December 3, 2019. The complaint asserts eight claims against all defendants: (1) a claim for discrimination based on disability in violation of Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act, 29 U.S.C. 794; (2) a claim under 42 U.S.C. § 1983 for due-process violations and failure to provide a FAPE as guaranteed by IDEA, 20 U.S.C.A. § 1400(d)(1)(A); (3) a claim under § 1983 for violations of IDEA; (4) a claim for violations of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 111; (5) negligence; (6) retaliation; (7) negligent and intentional infliction of emotional distress; and (8) loss of consortium.

Defendants have moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(1) for lack

of subject-matter jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

## II.     <u>Legal Standards</u>

On a motion to dismiss for lack of subject-matter jurisdiction made pursuant to Fed. R. Civ. P. 12(b)(1), "'the party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (quoting *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993)).  When ruling on a 12(b)(1) motion the court "must credit the plaintiff's well-[pleaded] factual allegations and draw all reasonable inferences in the plaintiff's favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010).

On a motion to dismiss made pursuant to Rule 12(b)(6), the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

### III.    <u>Analysis</u>

Defendants have moved to dismiss the complaint.  Their primary contention is that the complaint should be dismissed for lack of subject-matter jurisdiction because all eight counts are "a derivative repackaging of violations of [IDEA] under a different legal theory," and therefore "should be viewed within the scope of IDEA requirements, specifically the statutory scheme to exhaust administrative remedies" at the BSEA.  They further contend that because plaintiffs failed to exhaust their administrative remedies at the BSEA, as IDEA requires, the complaint should be dismissed.  In the alternative, they contend that once Counts One through Four are dismissed for failure to exhaust administrative remedies, the Court should decline to exercise supplemental jurisdiction over Counts Five through Eight, the state-law claims.  They further contend that the complaint should be dismissed because plaintiffs have failed to plead all factual elements required at law.

Plaintiffs oppose the motion, contending that IDEA's exhaustion requirement is limited to equitable claims, and does not apply to their claims for money damages for denial of a FAPE. Plaintiffs primarily rely on the *Fry* case to support that proposition.  *See Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017).  They further contend that the court has supplemental jurisdiction over the state-law claims because the federal and state claims arise from a common nucleus of operative fact.

For the reasons discussed below, the Court finds that IDEA's exhaustion requirement is not limited to equitable claims, and that plaintiffs in fact have failed to satisfy that requirement. Counts One, Two, Three, Four, and Five will therefore be dismissed for lack of subject-matter jurisdiction.  The Court further finds that the remaining state-law claims are effectively based on the IDEA claims, and will therefore be dismissed.

## A.    <u>Failure to Exhaust Under IDEA</u>

IDEA's exhaustion provision provides as follows:

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l). That exhaustion requirement "is not limited to claims based directly upon violations of the IDEA, and applies "even when the suit is brought pursuant to a different statute so long as the party is seeking relief that is available under subchapter II of IDEA." *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 59 (1st Cir. 2002); *Rose v. Yeaw*, 214 F.3d 206, 210 (1st Cir. 2000).

In *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 29 (1st Cir. 2006), the First Circuit held that "where the underlying claim is one of violation of the IDEA, plaintiffs may not use § 1983—or any other federal statute for that matter—in an attempt to evade the limited remedial structure of the IDEA." One district court has held that IDEA's exhaustion requirement "applies to actions brought under the IDEA, the ADA, § 504, or any § 1983 claim based upon violations of a student's IDEA rights." *CBDE Pub. Sch. v. Massachusetts Bureau of Special Educ. Appeals*, 2012 WL 4482296, at *6 (D. Mass. Sept. 27, 2012) (citing *Weber v. Cranston Sch. Comm.*, 212 F.3d 41, 51-52 (1st Cir. 2000); *Rose*, 214 F.3d at 210; *Bowden v. Dever*, 2002 WL 472293, at *4-5 & n.6 (D. Mass. Mar. 20, 2002)). In those cases, "[a] district court, therefore, has no subject matter jurisdiction . . . until this exhaustion requirement has been met." *Id.* (citing *Polera v. Board of Educ. of the Newburgh Enlarged Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002)).

However, exhaustion under IDEA "may not be required" in "certain cases." *Pihl v. Massachusetts Dep't of Educ.*, 9 F.3d 184, 190 (1st Cir. 1993). Those limited exceptions to exhaustion are "where the pursuit of administrative remedies would be (1) futile or inadequate; (2) waste resources, and work severe or irreparable harm on the litigant; or (3) when issues raised involve purely legal questions." *Id.* "The party seeking exemption bears the burden of establishing that it applies." *Id.* (citing *Rose*, 214 F.3d at 210). The fact that the BSEA lacks authority to award money damages does not render an IDEA-based claim that seeks money damages under § 1983 futile, however, and exhaustion is not excused in such a case. *See Frazier*, 276 F.3d at 63-64.

The cases discussed above preceded the decision of the United States Supreme Court in *Fry v. Napoleon Community Schools*, 137 S. Ct. 743 (2017). In that case, the Court held that IDEA's exhaustion requirement applies only where the plaintiff "seek[s] relief for the denial of a FAPE, because that is the only relief the IDEA makes available." *Id.* at 752 (quotations omitted). The Court observed:

> [Section] 1415(*l* )'s exhaustion rule hinges on whether a lawsuit seeks relief for the denial of a free appropriate public education. If a lawsuit charges such a denial, the plaintiff cannot escape § 1415(*l* ) merely by bringing her suit under a statute other than the IDEA—as when, for example, [a plaintiff] claim[s] that a school's failure to provide a FAPE also violated the Rehabilitation Act. Rather, that plaintiff must first submit her case to an IDEA hearing officer, experienced in addressing exactly the issues she raises. But if, in a suit brought under a different statute, the remedy sought is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required . . . . A school's conduct toward such a child—say, some refusal to make an accommodation—might injure her in ways unrelated to a FAPE, which are addressed in statutes other than the IDEA. A complaint seeking redress for those other harms, independent of any FAPE denial, is not subject to § 1415(*l* )'s exhaustion rule because, once again, the only "relief" the IDEA makes "available" is relief for the denial of a FAPE.

*Id.* at 754-55 (footnote omitted).

The Supreme Court in *Fry* further concluded that "in determining whether a suit indeed

seeks relief for [a FAPE denial], a court should look to the substance, or gravamen, of the plaintiff's complaint." *Id.* at 752 (quotations omitted). It observed that "[o]ne clue to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination, can come from asking a pair of hypothetical questions."

> First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say, a public theater or library? And second, could an adult at the school—say, an employee or visitor—have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

*Id.* at 756.

The Supreme Court also observed that "[a] further sign that the gravamen of a suit is the denial of a FAPE can emerge from the history of the proceeding."

> In particular, a court may consider that a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute—thus starting to exhaust the Act's remedies before switching midstream. . . . . A plaintiff's initial choice to pursue that process may suggest that she is indeed seeking relief for the denial of a FAPE—with the shift to judicial proceedings prior to full exhaustion reflecting only strategic calculations about how to maximize the prospects of such a remedy. Whether that is so depends on the facts; a court may conclude, for example, that the move to a courtroom came from a late-acquired awareness that the school had fulfilled its FAPE obligation and that the grievance involves something else entirely. But prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, *even if the complaint never explicitly uses that term.*

*Id.* at 757 (emphasis added).

Since *Fry* was decided, the First Circuit issued its opinion in *Parent/Professional Advocacy League*. "Applying *Fry* for the first time in [the First Circuit]," the court concluded

that the plaintiffs' claim for disability-based discrimination under the ADA was nonetheless

subject to the IDEA's exhaustion requirement where it "[sought] relief that [was] also available"

under the IDEA. 2019 WL 3729033, at *7 (quoting 20 U.S.C. § 1415(1)). The court observed:

> On its surface, the complaint pleads disability-based discrimination: it alleges that the
> defendants are violating the ADA by unnecessarily segregating students with mental
> health disabilities in a separate and unequal educational program. And the complaint
> never uses the term FAPE. Yet, the crux of the complaint is that the defendants failed to
> provide the educational instruction and related services that the class plaintiffs need to
> access an appropriate education in an appropriate environment. That is not a claim of
> simple discrimination; it is a claim "contesting the adequacy of a special education
> program."

*Id.* (quoting *Fry*, 137 S. Ct. at 755).

Here, Counts One through Five of the complaint *explicitly* use the term FAPE—indeed,

the denial of a FAPE is the specific harm alleged in those causes of action. Count Four, for

example, although brought under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §

111, alleges that "[d]efendants violated plaintiff's rights under state and federal law to be free

from discrimination based on her disability *and her right to a FAPE*." (Compl. ¶ 143) (emphasis

added). And Count Five, a claim for negligence, alleges that "[d]efendants breached the duty of

care owed to Jane of a FAPE . . . ." (*Id.* ¶ 155).

Counts One though Three invoke the denial of a FAPE as the basis for the cause of action

even more explicitly. Count One alleges that the denial of a FAPE resulted in discrimination

based on Jane's disability, in violation of Title II of the ADA and § 504 of the Rehabilitation

Act. (*Id.* ¶¶ 82-108). Count Two alleges due-process violations, through § 1983, and failure to

provide a FAPE as guaranteed by IDEA. (*Id.* ¶¶ 109-22). Count Three alleges the denial of a

FAPE and failure to comply with IDEA through § 1983. (*Id.* ¶¶ 122-40).

In addition, Counts One through Five all fail the hypothetical-questions test set forth by

the Supreme Court in *Fry* for determining if a claim addresses disability-based discrimination,

and not the denial of a FAPE. As to the first question, if the alleged conduct by defendants had occurred at a public theater or a library, plaintiffs could not have brought essentially the same claims as they do here. As to the second, an adult employee or visitor at MERSD could not have pressed essentially the same grievance as plaintiffs do here.

With respect to Counts One through Five, therefore, the gravamen of each cause of action is the denial of a FAPE. Those counts are therefore subject to IDEA's exhaustion requirement, and subject to dismissal on that basis.

That is not the end of the analysis, however, because the plaintiffs here seek money damages to compensate them for what are essentially emotional injuries. (*See, e.g.*, Compl. ¶¶ 117, 122, 129, 145, 160, 168, 174-75; *id.* at 47). The Court in *Fry* was clear that its decision did not address "a case in which a plaintiff, although charging the denial of a FAPE, seeks a form of remedy that an IDEA officer cannot give—for example, . . . money damages for resulting emotional injury." *See* 137 S. Ct. at 754 n.8; *see also id.* at 752 n.4 ("[W]e leave for another day a further question . . . : Is exhaustion required when the plaintiff complains of the denial of a FAPE, but the specific remedy she requests—here, money damages for emotional distress—is not one that an IDEA hearing officer may award?").

The First Circuit does not appear to have addressed the question of exhaustion and money damages posed by *Fry*.[3] However, several district court opinions decided after *Fry* have concluded that claims for money damages are subject to IDEA's exhaustion requirement. *See Doucette v. Jacobs*, 288 F. Supp. 3d 459, 476 (D. Mass. 2018) ("[I]t is clear in the First Circuit that the fact that the plaintiffs are seeking only monetary damages does not relieve them of the requirement that they exhaust their administrative remedies."); *Johnson v. Boston Pub. Sch.*,

---

[3] The plaintiffs in *Parent/Professional Advocacy League* sought only declaratory and injunctive relief. *See* 2019 WL 3729033, at *1.

2018 WL 1524397, at *2 (D. Mass. Mar. 28, 2018) ("[E]xhaustion is required where plaintiffs seek money damages"); *Raymond v. Maine Sch. Admin. Dist. 6*, 2019 WL 2110498, at *10 (D. Me. May 14, 2019) ("Plaintiffs' demand for monetary damages under § 504 does not foreclose the exhaustion requirement under the IDEA."); *Tveter v. Derry Coop. Sch. Dist. SAU #10*, 2018 WL 3520827, at *3 (D.N.H. July 20, 2018) ("The duty to exhaust administrative remedies applies both to claims for injunctive relief and claims for damages even though the IDEA does not provide a private right to sue for damages."); *T.K. v. Town of Barnstable*, 2018 WL 3748166, at *9 (D. Mass. Aug. 6, 2018) (same).

> As one district court concluded:

> In the absence of clarification of this point from the Supreme Court, this court continues to follow the approach taken by the First Circuit in *Frazier*, which is to require exhaustion, even if monetary damages are sought, because the ultimate determination as to the appropriateness of monetary damages will be informed by the administrative record assembled during the exhaustion of IDEA procedural remedies."

*S.S. by S.Y. v. City of Springfield*, 332 F. Supp. 3d 367, 377 n.8 (D. Mass. 2018).

Plaintiffs contend that *Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 279, 309 (D. Mass. 2017), "speaks directly to the point," and supports their contention that "[w]here equitable remedies are inadequate to compensate a Plaintiff, she is permitted to pursue damages through common law or other statutes." (Pls. Mem. in Opp. at 5). *Thomas* does speak directly to the issue of exhaustion under IDEA and money damages, but not in plaintiffs' favor. In that case, the court dismissed the plaintiffs' IDEA claim for failure to exhaust administrative remedies, despite their claim for reimbursement for costs related to the child's transfer from public school to private school. The court concluded that the plaintiffs had failed to meet their burden of proving an exemption to exhaustion merely "by claiming in a conclusory manner that IDEA procedures would have been futile" or inadequate to remedy the alleged FAPE deprivation and

accompanying claim for money damages. *See id.* at 308-09.

In the absence of further appellate clarification, the Court will continue to follow the First Circuit's approach in *Frazier*. Plaintiffs' claims are therefore subject to IDEA's exhaustion requirements, notwithstanding their request for money damages. Counts One though Five will therefore be dismissed for lack of subject-matter jurisdiction.

**B.      The Remaining Claims**

The remaining state-law claims (Counts Six, Seven, and Eight) are not as directly premised on the denial of a FAPE. Nonetheless, their success is clearly dependent on proof of an IDEA violation, and therefore the claims are likewise foreclosed. *See Diaz-Fonseca*, 451 F.3d at 29 ("where the underlying claim is one of violation of the IDEA, plaintiffs may not use § 1983— or any other federal statute for that matter—in an attempt to evade the limited remedial structure of the IDEA"); *Millay v. Surry Sch. Dep't*, 2009 WL 5184388, at *28-29 & n.31 (D. Me. Dec. 22, 2009) (where additional claims "are not premised on facts and circumstances extraneous to the process of trying to provide a [FAPE]," those claims should be dismissed, not on exhaustion grounds, but rather because "they are presented on facts bound together with [an] IDEA claim and *Diaz-Fonseca* forecloses relief in such situations"), *report and recommendation adopted sub nom. Millay ex rel. YRM v. Surry Sch. Dep't*, 707 F. Supp. 2d 56 (D. Me. 2010) (citing *Diaz-Fonseca*, 451 F.3d at 29).

Count Six alleges retaliation against all defendants under the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258, § 2. It alleges that defendants retaliated against plaintiffs, in various ways, for engaging in protected activity under Section 504 of the Rehabilitation Act and Title II of the ADA. Specifically, it alleges that Principal Guditis, "acting as agent of all defendants," retaliated against plaintiffs for engaging in protected activity when he filed a CRA

case with the Essex Juvenile Court in December 2015 after Jane stopped going to school. (Compl. ¶ 166). It further alleges that Superintendent Beaudoin, also "acting as agent of all defendants," retaliated against plaintiffs for engaging in protected activity by refusing to permit Jane to attend a school dance in October 2016, and by "revoking [her] permission to attend MERSD journalism club." (*Id.* ¶ 167).

Normally, a retaliation claim can be brought even if the plaintiff cannot prove a violation of the underlying statute. "Both the Rehabilitation Act, through its implementing regulations, *see* 28 C.F.R. § 42.503(b)(1)(vii), and the ADA, *see* 42 U.S.C. § 12203(a), prohibit retaliation against any person, whether disabled or not, for opposing disability-based discrimination made unlawful by those statutes." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 40 (1st Cir. 2012). "A plaintiff need not succeed on a disability discrimination claim in order to assert a claim for retaliation." *Id.* at 40-41 (citing *Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17, 36 (1st Cir. 2011)). Although retaliation claims may "overlap, in part," with an IDEA claim, claims for retaliation that "rest on improper retaliatory intent, are by no means mirrors of the IDEA." *Id.* at 41 (citing *Ramírez-Senda ex rel. M.M.R.-Z. v. Puerto Rico*, 528 F.3d 9, 15 (1st Cir. 2008); *Diaz-Fonseca*, 451 F.3d at 29).

Here, however, the retaliation claim is not independent of the claims for denial of a FAPE. The first incident, involving the filing of the CRA case, was a truancy-enforcement effort that is inextricably intertwined with the dispute concerning the alleged wrongful denial of a FAPE. Among other things, plaintiffs cannot prove retaliation without also proving a failure to provide a FAPE; if the school acted properly, then Cindy was not justified in keeping Jane out of school, and it was appropriate for Principal Guditis to file an action for truancy.

The *Millay* court found, under analogous facts, that truancy enforcement is an "inevitable

characteristic of this kind of IEP impasse" where the parent of the disabled child contends that "she had no choice but to keep [the child] home due to violations of the IDEA," and the school contends that "it has no choice but to report habitual truancy under [state] law." *Millay*, 2009 WL 5184388, at *29. "Moreover," the court observed, "as far as discrimination is concerned, truancy enforcement is meant to result in attendance at school, not exclusion from school." "Because [a truancy enforcement] effort is designed to ensure attendance and participation," the court concluded that "it does not run afoul of the Rehabilitation Act and the ADA's prohibition against exclusion from programs and activities on the basis of disability." *Id.* The court ultimately concluded that the plaintiff's "truancy enforcement theory of [discrimination or] retaliation [was] subsumed within the rule applied in *Diaz-Fonseca*." *Id.* The court observed:

> The truancy concern is an inevitable feature of an IDEA controversy in which the parent refuses to send a child to what she regards as an inappropriate special education program that the school maintains is appropriate, at least where the parent has not arranged for placement in a private program of her own choosing or submitted paperwork in support of a home-schooling program. After all, it is the IDEA that generates [the parent's] contention that [the child] is entitled to a specific special education program to be administered at a specific public high school. Relabeling the claims as [discrimination or] retaliation claims does not succeed in making them something other than claims related to the evaluation and placement of [the child] under the IDEA.

*Id.*

The other incidents, involving Superintendent Beaudoin's refusal to allow Jane to attend a dance or participate in journalism club, are likewise inextricably intertwined with, and dependent on, the IEP impasse between the parties. Jane was not enrolled in the MERSD schools at the time she sought to participate in those extracurricular activities; the Dizios had withdrawn her from school because of defendants' alleged failure to provide her with a FAPE. And, according to the complaint, school officials would not allow Jane to participate in school activities because she was not enrolled in school.

Of course, any claim for retaliation in an IDEA case necessarily flows from the plaintiffs' assertion of rights under the statute. The claims in Count Six, however, arise from Jane's absence from school, and are based entirely on the school's efforts to enforce her attendance and address the consequences of her absence. Again, and as a practical matter, it would be impossible to try such claims without trying the underlying claim for denial of a FAPE; whether Jane's absence was justified, or the school's actions were appropriate, depends entirely on whether the school had met its statutory obligations under IDEA. Count Six therefore fails to state a claim for retaliation independent of IDEA, and accordingly will be dismissed.

Count Seven alleges negligent and intentional infliction of emotional distress ("NIED") due to defendants' discrimination and retaliation against Jane Doe. It specifically alleges that despite MERSD's "aware[ness]" of Jane's various alleged disabilities and emotional disorder, and despite "repeated updates regarding Jane's mental deterioration, breakdowns, crying episodes, and overall depression and anxiety, Defendant[s] continued to retaliate against her." (Compl. ¶ 171). The alleged retaliation, again, consisted of truancy enforcement efforts and a refusal to permit a non-student to participate in student activities. Those allegations flow directly from the defendants' alleged retaliation against Jane, which, as discussed above, are allegations bound up with the IDEA claims. The NIED claim therefore "does not give rise to a plausible entitlement to relief against [defendants] beyond the remedies authorized by the IDEA," and will be dismissed. *See Millay*, 2009 WL 5184388, at *29.

Finally, Count Eight is a claim by Cindy and Jim for loss of consortium pursuant to Mass. Gen. Laws ch. 231, § 85X. It specifically alleges that "[a]s a direct and proximate result of the defendants' negligence, Cindy and Jim Dizio have been deprived of the society, love, affection, companionship, care and services of their child, Jane . . . ." (Compl. ¶ 178). Because the claim

for loss of consortium is based on Count Five's claim for negligence due to "[d]efendants breach[] [of] the duty of care owed to Jane of a FAPE, (*id.* ¶ 155), which will be dismissed for failure to exhaust administrative remedies under IDEA, Count Eight does not state a plausible claim for relief, and will also be dismissed.

In summary, the remaining state-law claims for retaliation (Count Six), negligent and intentional infliction of emotional distress (Count Seven), and loss of consortium (Count Eight) will be dismissed in accordance with *Diaz-Fonseca* for failure to state a claim upon which relief can be granted.[4]

## IV.    Conclusion

For the foregoing reasons, defendants' motion to dismiss is GRANTED as to Counts One, Two, Three, Four, and Five under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction, and as to Counts Six, Seven, and Eight under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

**So Ordered.**


                                              /s/  F. Dennis Saylor
                                              F. Dennis Saylor IV
Dated: August 12, 2019                        United States District Judge

---

[4] The Court notes that it would decline to exercise supplemental jurisdiction over any of the state-law claims even if they were viable.